## THE ROLF.[1]

### LAW et al. v. THE ROLF.

*(District Court, E. D. New York. July 24, 1891.)*

COLLISION—SAIL-VESSELS CROSSING—COLLISION RULES, ART. 14, (c.)
    Collision occurred on the high seas, on a clear morning, between the ship Rolf and the bark Boyd. The Rolf, bound from Havre to Sandy Hook, was sailing at least two points free, with the wind on her starboard side. The Boyd, bound from New York to Hong-Kong, had the wind on her port side. Her contention was that she was sailing close-hauled. The Rolf's witnesses asserted that the Boyd also was sailing free. The Boyd did not alter her course. The Rolf put her helm up after collision was inevitable, but was struck on her starboard side. *Held*, on the evidence, that the Boyd, as well as the Rolf, was sailing free, and hence, under the International Collision Rules, art. 14, (c,) (23 St. at Large, p. 441,) the Boyd was bound to avoid the Rolf, which had the wind on her starboard side, and was liable for her failure so to do

In Admiralty. Suit for damage caused by collision.
*Wing, Shoudy & Putnam,* for the Boyd.
*Butler, Stillman & Hubbard,* for the Rolf.

BENEDICT, J. This is an action brought by the owners of the bark Emilie L. Boyd against the ship Rolf, to recover the sum of about $128,-000, damages resulting from a collision that occurred between those two vessels on the 15th day of January, 1890, on a bright morning, in latitude 25° 40′ N., longitude 32° 56′ W. The bark Boyd was bound on a voyage from New York to Hong-Kong, laden with case oil. The Rolf was a full-rigged ship, bound from Havre to Sandy Hook, in ballast. The collision occurred about 7 o'clock in the morning, when the weather was clear, and between vessels moving from six to eight knots an hour, under a good sailing breeze, the Boyd having the wind on her port side, and the Rolf having the wind on her starboard side. Each vessel was plainly seen by the other at a distance of five or six miles, and each vessel continued in full view of the other, no other vessels being in sight, until, without exchange of hail or shout, the vessels came in violent collision, the bark striking the ship on the ship's starboard side nearly at right angles, the jib-boom of the bark piercing the ship's mainsail. In

---

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

the collision the yards on the foremast of the Rolf were broken, her main and mizzen masts swept clean to the deck, her wheel smashed, and her hull badly injured. After the collision she succeeded, however, in reaching St. Thomas, whence she was towed to New York. The Boyd herself was so injured by the collision that she filled within a very few moments, and both vessel and cargo became a total loss, her crew reaching the Rolf by the means of the boats, and being taken in the Rolf to St. Thomas. According to the proof, the Rolf was sailing with the wind at least two points free. The rules of navigation required her, therefore, to give way to the Boyd, provided the Boyd was sailing close-hauled; but, if the Boyd was also sailing free, the rules made it the duty of the Rolf to hold her course, and required the Boyd to avoid the Rolf, because, as it is conceded, the Boyd had the wind on her port side. The decision of the case therefore depends upon the question whether the Boyd was, as she asserts, close-hauled on the port tack, with her yards braced up as sharp as possible; or whether she was sailing with the wind free, as those on the Rolf assert. Upon this question the conclusion that I have arrived at after a minute examination of the testimony, aided by the careful arguments of the respective advocates, is that the proofs do not permit a decision in favor of the contention made in behalf of the Boyd, but compel a decision that the Boyd was sailing with the wind free, and consequently was in fault for not keeping out of the way of the Rolf. This decision has been in a large degree arrived at from a consideration of what was done and said on board the Rolf while the Boyd was approaching her in plain sight; for whether the Boyd, as she approached the Rolf, was sailing free or close-hauled was as obvious to those on the Rolf as to those on the Boyd herself. Under the circumstances, a mistake in such a matter on the part of those on the Rolf was no more possible than a mistake on the part of those on board the Boyd. When, therefore, the acts done by those on board the Rolf are consistent with their statement that what they saw was the Boyd sailing free, and when these acts are of such a character as to make it impossible to believe that they would have been done unless the Boyd was sailing free, the conclusion is forced upon the mind that the Boyd was sailing free when seen by the numerous witnesses on board the Rolf, who concur in saying that they saw her, and saw that she was approaching with a free wind.

Some of the acts to which allusion has been made may be mentioned. As already stated, it was a bright morning. There was a good breeze blowing. Both vessels were in plain sight of each other for a considerable period of time. They were upon the open sea, with no other vessels in sight to interfere with or effect their movements. The Boyd was seen and reported by the lookout of the Rolf when four or five miles away. She was at the same time seen by the man at the wheel of the Rolf, and shortly by many others. "All went up to the rail to have a look at her." She and her course were a matter of remark on the Rolf's deck. She was examined by the officer in charge of the deck of the Rolf through a glass, and he saw no occasion to call the master to the deck, or to

change the course of his ship. The master happened, however, to come on deck some 10 minutes before the collision, and he too observed the Boyd with his glass, and found nothing in her to require action on his part. The carpenter, after seeing the Boyd, went below into the forehold, and there mentioned her approach to a seaman in the forehold, but not as a thing making it worth while to be out of the hold, and the man remained in the forehold until the alarm was given: "The bark is coming on board of us." After the Boyd was seen to be approaching, two of the Rolf's crew were ordered into the rigging on ship's work, the Boyd being then conspicuous, and known to be approaching the course of the Rolf. One of the men went without fear to bend the fore upper topsail to the jackstay, and remained there until the moment of the blow. The other, ordered to take a marline-spike and some spun yarn, and go up and put some service on the foot-rope on the main royal yard, went without fear up to the main royal yard, observing the Boyd as he went up the main rigging. The blow knocked him off the yard into the sea. The master, who remained on the poop, watched the Boyd as she approached his course, and did and said nothing until, when it was plain that the Boyd was coming on board his vessel, he ordered the wheel hard up. On hearing that order, a man who was at work in the cabin-house scraping, and who had observed the bark until then without any idea of danger, jumped to help the man at the wheel, but just reached the wheel, when he was compelled to run for his life, and by the time he reached the lee side of the cabin-house the main rigging fell. No change in the Rolf's course was effected. No hail was given to the Rolf, nor by her. It seems to be impossible that these things could have been done on board the Rolf by persons who saw the Boyd then approaching in plain sight, unless it be true, as they say, that the Boyd was running free, and that the only obligation upon the Rolf was to hold her course, and the duty of the Boyd was to avoid her. The rules of navigation applicable to such vessels were known to all who were looking at the Boyd as she approached, and there was no possibility of their mistaking a vessel close-hauled for a vessel sailing free. Several of them testify that they saw the Boyd's sails shaking when she came upon them. As against this there is very positive testimony from those on board the Boyd that she was sailing close-hauled, with her yards braced up sharp. But the testimony of these witnesses from the Boyd is no more explicit than the testimony of the witnesses from the Rolf; their opportunity of observation was no greater; the likelihood of bias no less; and in numbers they are 5 as against 10 or 11 from the Rolf; and it must be added that the exceeding positiveness of assertion on the part of the witnesses from the Boyd is such as to attract attention. Nor has it been overlooked that the witnesses from the Rolf give testimony calculated to put the Boyd much higher up in the north than it was possible for her to have been; but, after weighing carefully this testimony as it is given by the witnesses from the respective vessels, I am unable to resist the conclusion that the weight of the evidence is that the Boyd was sailing with the wind free. Still further, the witnesses

from the Boyd prove things said and done on board the Boyd as she approached, which, in my opinion, afford an explanation of the extraordinary collision that ensued, for they show the existence of a motive on the part of the Boyd to run dangerously near the Rolf, and they also account for the failure of the Boyd to luff when the danger of collision became imminent. It appears by the testimony produced in behalf of the Boyd that, when the danger of collision became imminent, there was no officer on her deck to give orders to luff, and this notwithstanding that it was intended to pass very close to the Rolf. The mate of the Boyd, who was in charge of the deck after the Rolf was seen to be approaching, made up his mind to communicate with the Rolf by word of mouth. This is equivalent to saying that he intended to come within 100 or 150 feet of the Rolf as she passed. The Boyd was bound to the east on a long voyage, and desired to be reported by the Rolf. The mate at first determined to report by means of flags, and for this purpose the proper flags to give the Rolf the Boyd's number were got out and made fast upon the halyards. The idea of using flags was then abandoned, and the mate determined to speak the Rolf by word of mouth. In pursuance of this determination the mate left the deck, and went to the cabin for the purpose of calling the captain, in order that he might speak to the Rolf by word of mouth. The contention on the part of the Boyd that it was the Rolf that desired to speak the Boyd, instead of the Boyd that desired to speak the Rolf, is not supported by the weight of evidence. The protest of the Boyd says distinctly that the Boyd intended to speak to the Rolf. According to the testimony of the man at the wheel, what the man said when he called the captain was: "If you wish to come on deck, here is a vessel that is going to pass our stern, if you wish to speak." These circumstances show not only that the mate of the Boyd misjudged the relative speed of the two vessels, otherwise he would never have left the deck when he did, but also that there was a motive for the Boyd to come very near to the Rolf. If the mate had remained on deck, no doubt the collision would have been avoided, for a very slight luff on the part of the Boyd would have enabled her to pass under the stern of the Rolf, as all on board of the Rolf expected the Boyd to do. In leaving the deck when he did, the mate was guilty of a serious fault, and before he returned to the deck the man at the halyards announced that the Rolf was putting up her helm. The mate then rushed for the deck, followed close by the master, but the vessels were in contact, and nothing could then be done. Not only does the evidence introduced on the part of the Boyd show fault committed by the mate in leaving the deck at a critical moment, but it requires the rejection of his statement, and that of the other witnesses from the Boyd, that the Boyd was sailing close-hauled, with yards braced sharp up; for it is inconceivable that the mate in command of the Boyd, sailing under a fresh breeze at the rate of six knots an hour, on a course crossing the course of a vessel approaching at a speed of eight knots an hour, would determine to go near enough to the

approaching vessel to communicate by word of mouth, unless he at the same time knew that the approaching vessel would hold her course, and that the distance between the vessels as they passed would therefore be completely under his control. This could not be unless the Boyd had the wind free. Still further, the approach of these two vessels on crossing courses within hailing distance of each other involved danger. In my opinion, it would never have been contemplated by the mate of the Boyd if his yards had been braced sharp up, and he under the belief that it was the duty of the Rolf to avoid him, and therefore possible that the Rolf might at any moment change her course. The mate, when he left the deck, must have believed that it was the duty of the Rolf to hold her course, which was impossible if the Boyd was close-hauled; and he acted upon the belief that he could approach within speaking distance of the Rolf without danger, which also would have been impossible if his yards had been braced up sharp. It should also be noticed in connection with the question whether the Boyd was sailing free that, according to the hydrographic chart and the sailing chart which the Boyd herself carried, it is impossible that the Boyd at that stage of her voyage would have been sailing on the course she claims if the wind would permit her to go more to the southward of that course. There seems to be no reason why she should be sailing close-hauled on the wind, thereby losing four knots an hour, according to the mate's estimate, in order to keep the course she claims, when it would have been to her advantage to keep more to the southward. These are some of the considerations that have led me to the decision I am about to announce. There are others pointing to the same conclusion, but enough has been said to afford, as I think, sufficient ground for a rejection of the libel. Let a decree be entered dismissing the libel, with costs.